[Doc. No. 65]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

JAIME M. BELL, Administrator
Ad Prosequendum of Estate of
Steven Charles Bell,

      Plaintiff,

  v.

CUMBERLAND COUNTY, et al.,

      Defendants.

Civil No. 09-6485 (JHR/JS)

## OPINION

This matter is before the Court on "Plaintiff's Motion to Disqualify Counsel for the Cumberland County Defendants" [Doc. No. 65] (hereinafter "defendants"). The Court received defendants' opposition, the parties' supplemental submissions, and held two hearings.[1] While the Court is convinced that defense counsel could have and should have done some things differently, plaintiff's motion is nevertheless denied.

**BACKGROUND**

This case arises from the death of Steven Bell ("Mr. Bell"). On December 31, 2007, Mr. Bell was arrested due to an apparent

---

[1] The Court received affidavits from plaintiff Jaime Bell (December 8, 2011 (reviewed in camera) and March 12, 2012), Brendan Kavanagh, Esquire (February 21, 2012), Victoria Kavanagh, Esquire (February 22, 2012), Kimberly A. Procopio, Esquire (February 17, 2012), Barbara Butcher (March 22, 2012 and April 5, 2012), Stephanie Custodio (March 22, 2012), Ella McDonell (March 22, 2012) and Janis Webster (March 22, 2012 and April 5, 2012). Hearings and oral argument were held on February 6, 2012 and March 30, 2012.

domestic altercation and taken to Cumberland County Jail. Amended Complaint ¶18. On January 1, 2008, at approximately 2:30 p.m., Mr. Bell was found unconscious and unresponsive in his cell. Id. ¶23. Plaintiff, Jaime M. Bell, alleges Mr. Bell was "viciously and brutally beaten."[2] Id. ¶24. Plaintiff also alleges the assailants could only have been corrections officers, inmates or detainees. Id. ¶25. Plaintiff further alleges defendants were deliberately indifferent to Mr. Bell's serious medical needs. Id. ¶¶ 27-30. Mr. Bell died on January 10, 2008.

Mr. Bell's original autopsy report from the Office of the Medical Examiner of the City of Philadelphia ("Medical Examiner") concluded that his death was a homicide, e.g., blunt force trauma to the back of the head. In addition, the February 7, 2008 report prepared by the Vineland Police Department ("VPD") referred to the possibility that Mr. Bell was injected (by himself or someone else) with a high dose of insulin. On February 2, 2011, the Medical Examiner amended the manner of death to "undetermined." The amended report concluded: (1) Mr. Bell's brain injuries may have been caused by attempts to rouse him from a coma rather than an assault; (2) the autopsy could not discern the relative contribution of brain injury from severe hypoglycemia and mechanical brain trauma in the causation of the death, and (3) if Mr. Bell injected himself with insulin, it was not known whether he attempted to commit suicide or

---

[2]The Court acknowledges defendants' argument (discussed herein) that Ms. Bell is a plaintiff in her representative capacity, not her individual capacity.

if the injection was intended to get attention and/or his release from custody.  Mr. Bell's death was investigated by the Cumberland County Prosecutor's Office ("CCPO") who decided not to press criminal charges.

Mr. Bell's death was extensively investigated by the VPD and the CCPO.  Their reports, and those of the Medical Examiner, reveal that the cause of Mr. Bell's death is likely to be vigorously contested.  Although defendants deny that Mr. Bell was beaten, the Court does not presently know what if any reason they will give at trial as to the cause of Mr. Bell's death.  It is no secret that plaintiff's mother-in-law accused plaintiff of injecting her son with insulin.[3]  In addition, at all relevant times it was widely known that plaintiff and Mr. Bell had a "rocky" relationship that resulted in several domestic violence complaints.

This lawsuit was filed on December 23, 2009. The named plaintiff is "Jaime M. Bell, as Administrator Ad Prosequendum and as Administrator of the Estate of Steven Charles Bell, Deceased."  As noted, Jaime M. Bell is Mr. Bell's widow and the mother of his two children.  Defendants were originally represented in this lawsuit by Steven L. Rothman, Esquire, of Lipman Antonelli, et al.  On January 27, 2011, the law firm of Kavanagh & Kavanagh, LLC ("K&K") substituted in as defense counsel.  Brendan Kavanagh, Esquire, and Victoria Kavanagh, Esquire, husband and wife, are the named partners

---

[3]The VPD report indicates that the decedent's mother-in-law stated that her son allegedly told her "that he thought Jaime [plaintiff] was going to kill him, by injecting him with her insulin."  See February 9, 2009 Report at 2, Doc. No. 67-1.

3

in the firm.  Stephanie Olivo, Esquire, an attorney working for K&K, started to take Ms. Bell's deposition on November 1, 2011.  The deposition was adjourned after Ms. Olivo learned for the first time that K&K represented Ms. Bell in the past.  This was also when Ms. Bell learned K&K represented the defendants in her lawsuit. J. Bell March 12, 2012 Affidavit ¶9.  The present Motion to Disqualify was filed soon thereafter.

There is no dispute that Ms. Kavanagh represented Ms. Bell in connection with her worker's compensation claim arising from an accident that occurred on June 28, 2008.  Although the claim settled on March 8, 2010, the settlement provided that Ms. Bell could move to reopen her claim by March 8, 2012 if her shoulder injury worsened.  See Plaintiff's Brief, Exhibit 8.  Mr. Kavanagh also represented Ms. Bell in connection with a traffic citation she received and her subsequent March 24, 2010 court hearing.

Plaintiff contends that in the course of K&K's representation it learned confidential information that could be used against her in this lawsuit.  To be more specific, the communications at issue were with Ms. Kavanagh.  Plaintiff avers in her December 8, 2011 affidavit, reviewed by the Court in camera, that before she retained her present counsel she "spoke with Victoria Kavanagh about [Mr. Bell's] death and the possibility of looking into whether there was a case to bring." J. Bell Affidavit ("J. Bell Aff.") ¶8.[4]  Generally,

---

[4]The Court is authorized to review plaintiff's affidavit in camera.  See O Builders & Associates, Inc. v. Yuna Corp. of NJ ("O Builders"), 206 N.J. at 109, 129 (2011).

the affidavit discusses, <u>inter</u> <u>alia</u>, information plaintiff allegedly relayed to Ms. Kavanagh about the evening of Mr. Bell's arrest, discussions with Mr. Bell, her relationship with Mr. Bell, the history of her custody issues, problems with her mother-in-law, and other related issues.  Ms. Bell acknowledges Ms. Kavanagh told her "she could not represent [her] in any of these matters and said that [she] would need to seek a civil attorney and a family court attorney."  <u>Id.</u> ¶25.

Plaintiff argues defense counsel should be disqualified pursuant to R.P.C. 1.9(a) and 1.10(a).  Plaintiff alleges she relayed confidential information to Ms. Kavanagh in the course of her representation which could be used against her in this lawsuit. Defendants argue that Ms. Bell's prior representation is not substantially related to this case.  They also argue that Ms. Bell did not relay to them any confidential information and they "[n]ever discussed intimate details of Jaime Bell's life with her."  January 10, 2012 Letter Brief at 5.  Defendants contend that the potentially incriminating details of Ms. Bell's history are not confidential because they are part of the public record.  In addition, defendants contend that Ms. Bell is not the plaintiff because she is suing in her representative rather than individual capacity.

**DISCUSSION**

1.  <u>Motions to Disqualify</u>

The Court had occasion to discuss motions to disqualify in a recent opinion.  <u>See</u> <u>Martin v. AtlantiCare</u>, C.A. No. 10-6793

5

(JHR/JS), 2011 WL 5080255 (D.N.J. Oct. 25, 2011).  In the District
of New Jersey issues regarding professional ethics are governed by
L. Civ. R. 103.1(a).   This Rule provides that the Rules of
Professional Conduct ("R.P.C.") of the American Bar Association, as
revised by the New Jersey Supreme Court, shall govern the conduct of
members of the bar admitted to practice in the District. See L. Civ.
R. 103.1(a); Carlyle Towers Condo. Ass'n, Inc. v. Crossland Sav.,
FSB, 944 F.Supp. 341, 344-45 (D.N.J. 1996).  When deciding a motion
to disqualify counsel the movant bears the burden of proof that
disqualification is appropriate.   City of Atlantic City v. Trupos
("Trupos"), 201 N.J. 447, 462-63 (2010); Maldonado v. New Jersey, ex
rel., 225 F.R.D. 120, 136-37 (D.N.J. 2004).  The movant's burden is
a heavy one since "[m]otions to disqualify are viewed with
'disfavor' and disqualification is considered a 'drastic measure
which courts should hesitate to impose except when absolutely
necessary.'" Alexander v. Primerica Holdings, Inc., 822 F.Supp.
1099, 1114 (D.N.J. 1993) (quoting Schiessle v. Stephens, 117 F.2d
417, 420 (7th Cir. 1983) (internal quotation marks and citation
omitted)).  Nevertheless, "a motion for disqualification calls for
[courts] to balance competing interests, weighing the need to
maintain the highest standards of the profession against a client's
right freely to choose his counsel." Trupos, 201 N.J. at 462
(citing Dewey v. R. J. Reynolds Tobacco Co., 109 N.J. 201, 218
(1988)).  See also Twenty-First Century Rail Corporation v. New
Jersey Transit Corp. ("Twenty-First Century"), __ N.J. __, 2012 WL

1570025, at *5 (2012). In weighing this balance the Court is mindful that "there is no right to demand to be represented by an attorney [or law firm] disqualified because of an ethical requirement." Trupos, 201 N.J. at 462.

When determining whether to disqualify counsel the Court must closely and carefully scrutinize the facts to prevent unjust results. Montgomery Acad. v. Kohn, 50 F.Supp.2d 344, 349 (D.N.J. 1999). In Steel v. Gen. Motors Corp., 912 F.Supp. 724, 733 (D.N.J. 1995) (citation omitted), the court noted that its balancing "involves a 'painstaking analysis of the facts and precise application of precedent.'"   Id.   In addition, "[t]he decision whether to disqualify a law firm by imputation is best undertaken on a case-by-case basis, weighing the facts as they exist at the time the motion to disqualify is made.   New Jersey courts have consistently eschewed per se rules of disqualification, stressing the 'fact-sensitive nature' of a decision to disqualify counsel." Cardona v. Gen. Motors Corp., 942 F.Supp. 968, 976 (D.N.J. 1996).

Since disqualification issues are intensely fact-specific, it is essential to approach such issues with a sense of practicality as well as a precise understanding of the underlying facts. Murphy v. Simmons, Civ. No. 06-1535 (WHW), 2008 WL 65174, at *5 (D.N.J. Jan. 3, 2008)(citation and quotation omitted). Accordingly, the Court scrutinized the parties' detailed submissions and testimony and is

deciding defendants' motion based on the extensive record.[5]

    2.   <u>Standing</u>

    The Court's analysis starts with defendants' argument that Ms. Bell has no standing to raise a conflict because she is not the named plaintiff.  Defendants argue that Ms. Bell is suing in her representative capacity as the administrator <u>ad prosequendum</u> of the Estate of Steven Bell, and not her individual capacity.[6]  Therefore, defendants argue, "Cumberland County's interest [in the case] is not materially adverse to Jaime Bell's interests.  January 10, 2012 Letter Brief at 2-3.  Defendants' argument is rejected.  The Court finds that for conflict analysis purposes there is no distinction between whether Ms. Bell is a named plaintiff in her individual or representative capacity.  As the administrator of her husband's estate, Ms. Bell has the authority to prosecute, manage and settle the case.  Further, she stands to benefit the most from a judgment or settlement.  This puts her in the same position as if she sued in her individual capacity.  In addition, F. R. Civ. P. 17(a)(1)(B)

---

[5]Ordinarily a motion to disqualify should be decided on the basis of documentary evidence except where "the court cannot with confidence decide the issue on the basis of the information contained in those papers...." <u>Dewey</u>, 109 N.J. at 222.  Given the discrepancies in the affidavits submitted by Ms. Bell and Ms. Kavanagh, the Court felt it necessary to hear their version of events in-person.  Ms. Bell and Ms. Kavanagh appeared and testified at the March 30, 2012 hearing.  Mr. Kavanagh chose not to appear.

[6]Under New Jersey's Wrongful Death Act, a claim must be brought by the administrator <u>ad prosequendum</u> of the decedent or the executor of the decedent's estate.  N.J.S. 2A:31-2.  A survival action must be brought by the administrator of the decedent's estate or his executor. N.J.S. 2A:15-3.

specifically notes that an administrator is a real party in interest
in whose name an action must be prosecuted.  The Court will not
emphasize form over substance and will apply the applicable rules
and case law as if Ms. Bell sued only in her individual capacity.
<u>Accord</u> 6A Wright & Miller, <u>Federal Practice and Procedures</u> §1542 at
469 (2010)("As used in Rule 17(a), the real-party-in-interest
principle is a means to identify the person who possesses the right
sought to be enforced.  Therefore, the term directs attention to
whether plaintiff has a significant interest in the particular
action plaintiff has instituted, and Rule 17(a) is limited to
plaintiffs.").

> 3.  <u>R.P.C. 1.9(a) and 1.10(a)</u>

Plaintiff argues that K&K should be disqualified pursuant to
R.P.C. 1.9(a) and 1.10(a) which discuss the duties of counsel to
their former client.[7]  R.P.C. 1.9(a) states:

<u>RPC 1.9 Duties to Former Clients</u>

(a) A lawyer who has represented a client in a matter
shall not thereafter represent another client in the same
or a substantially related matter in which that client's
interests are materially adverse to the interests of the
former client unless the former client gives informed
consent confirmed in writing.

---

[7]Although plaintiff focuses her argument on a lawyer's duty
to a former client and, therefore, discusses R.P.C. 1.9(a), it is
not clear that R.P.C. 1.9(a) applies.  When plaintiff filed her
motion to disqualify on December 12, 2011, it was evident that
plaintiff was no longer a client of K&K.  However, when K&K
entered its appearance in the case on January 27, 2011, the
situation is not as clear.  The issue will be discussed <u>infra</u>.
Nevertheless, as will be discussed, the result is the same
whether plaintiff is treated as a current, former or prospective
client.

Plaintiff argues that since Ms. Kavanagh is disqualified pursuant to R.P.C. 1.9(a), it follows that the conflict is imputed to K&K under R.P.C. 1.10(a) and, therefore, K&K should be disqualified. R.P.C. 1.10(a) reads:

> RPC 1.10 Imputation of Conflicts of Interest: General Rule
>
> (a)  When lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by RPC 1.7 or RPC 1.9, unless the prohibition is based on a personal interest of the prohibited lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm.

At the outset of the Court's analysis of R.P.C. 1.9(a), it must determine if K&K ever represented plaintiff in the same matter now pending before the Court.  If not, the Court then must decide if K&K's former engagements for plaintiff were substantially related to this matter.  Two recent New Jersey Supreme Court cases address these situations.  See Twenty-First Century, supra; Trupos, supra.

Based on the present record, the Court finds that K&K did not represent plaintiff in connection with Mr. Bell's death.  The most persuasive evidence in this regard is plaintiff's March 30, 2011 testimony.  Tr. 42:14 to 63:25.  Plaintiff testified she picked an attorney out of the phone book regarding her worker's compensation claim.  Tr. 43:12-23.  Plaintiff retained Ms. Kavanagh on July 2, 2008, and they met for the first time on July 3, 2008.  See V. Kavanagh February 22, 2012 Affidavit ¶¶ 3-9.  On July 7, 2008, plaintiff called Ms. Kavanagh and left the following message:

MRI--5:30 workmens comp.  Husband was murdered in county

10

jail, wants to know if you [Ms. Kavanagh] can take case.
See Attachments to J. Webster April 5, 2012 Affidavit. Sometime
after July 7, 2008, plaintiff had another meeting(s) with Ms.
Kavanagh.

The Court sets out in full the relevant portions of plaintiff's
testimony concerning her meetings with Ms. Kavanagh:

> Q. According to Ms. Kavanagh's notes, the notes of her
> firm, you called on July 7th, 2008, to leave a message
> that you're having an MRI, and the notes of the phone
> message say, Husband was murdered in county jail, wants
> to know if you can take case. That was on July 7th,
> 2008. Do you remember that?
>
> A. I don't remember the exact date, but I do remember
> calling.
>
> Q. Do you remember then meeting with Ms. Kavanagh and
> discussing anything having to do with your husband's
> death?
>
> A. Again, we had a meeting already scheduled for
> something to do with the workmen's comp case, and I had
> just brought the folder with me, because I was trying to
> get the newspaper to stop telling their stories. I was
> having a battle with my mother-in-law. I was having the
> issue with the death of my husband. And I was just
> asking her questions like, What do I need to do? Can,
> you know, not necessarily as, Can you represent me, but
> how do I go about this?
>
> Q. And what feedback was Ms. Kavanagh giving you?
>
> A. At the end of her discussion, she told me because of
> -- because I didn't say it was like trying to sue the
> county, like that's not what I intended. I just wanted
> to know what happened to my husband. Like that's all I
> wanted to know. So I was just trying to -- and I wanted
> to get custody back of my kids and all that stuff, so I
> was just asking like, Who do I -- what kind of attorney
> would I need. And at that point she told me that I would
> have to seek a civil attorney and that because her firm
> has represented the county in the past, they would not
> be able to represent me.

11

Q. Was that at a meeting in Ms. Kavanagh's office close to the time when you left the phone message on July 7th?

A. Again, I don't recall the exact date.

Tr. 45:1 to 46:9.  Plaintiff also testified:

Q. Were you inquiring whether Ms. Kavanagh, or her firm at that time, could represent you?

A. I wasn't sure what to do. I just was asking questions, because I needed to know what I needed to do, because I didn't know what I needed to do. I didn't know nothing. I was just asking questions in general to find out what to do.

Q. Well, if you were asking questions of Ms. Kavanagh of what to do, how is it that you came to talk with her about the confidential information that you listed in [your] first affidavit?

A. Because I would explain the situation, and ask her, you know, what should I do next, you know, this is the problem. You know, explain the problem, and then her, as an attorney, try to get -- to find out what I needed to do. What was the next step. Like of how -- one of the things was I was having problem getting the death certificate -- how would I go about to get that? How would I go about getting the autopsy report? Because these are things that I didn't know how to do. How would I go about different steps that I had to take during the process of my husband's death, raising visitation with my kids, regaining visitation with my kids, the problems I was having with the newspapers, just like whatever that step was at that time, trying to figure out how I needed to go about doing that.

Tr. 47:12 to 48:12. In addition, plaintiff testified:

Q. Did there ever come a time when you asked her if she could represent you?

A. I don't think that I was asking her to specifically represent me, but I just was asking for advice.

Q. So how and why then did it come up that she told you that her law firm represented the county?

A. Because at -- at some point during the conversation it came up that it didn't happen in the county.

Q. And that's when she told you what?

A. And that's when she told me that her law firm has previously represented the county in the past, and that she could not -- she or her law firm could not represent me, and that she wouldn't be able to -- what's the word I'm looking for -- making a referral.

Q. But why would she tell you she couldn't represent you if you never asked her to represent you?

A. Because I was asking her for advice and maybe she saw it as like that I was asking her for representation. I just needed to know what I -- what was the next step I needed to take, and unfortunately I asked several lawyers a whole bunch of times, and didn't get really any advice.

Tr. 49:23 to 50:18.[8]

Given plaintiff's testimony, it is plain that K&K never represented plaintiff in connection with her husband's death. Plaintiff and Ms. Kavanagh agree there was no explicit agreement to this effect. Although an attorney-client relationship may occur by implication (Robinson v. Hornell Brewing Co., C.A. No. 11-2183 (NLH/JS), 2012 WL 71730, at *2 (D.N.J. Jan. 10, 2012)), this did not occur. In order to infer an attorney-client relationship the

---

[8]The Court credits plaintiff's testimony that she had these discussions with Ms. Kavanagh even though Ms. Kavanagh has no recollection they occurred. It is not unexpected that Ms. Kavanagh has no recollection of the discussions since the events occurred three-plus years ago and Ms. Kavanagh has a very busy law practice. Further, the Court finds it unlikely plaintiff did not mention her husband's death when she met with Ms. Kavanagh given the tumult in her life when they met in 2008, and the fact that she met with Ms. Kavanagh the day after her July 2, 2008 phone message. Although not clear, it appears that plaintiff met or spoke with Ms. Kavanagh, or visited her office, on July 3, 2008, July 22, 2008, August 26, 2008, and January 26, 2010. V. Kavanagh February 22, 2012 Affidavit ¶9.

parties must relate to each other as attorney and client.  Id.
(citations omitted).  A leading authority has stated, "the common
thread in cases in which a lawyer-client relationship is said to
have arisen by implication is reliance of the 'client' on the
professional skills of the attorney coupled with the attorney's
awareness of that reliance and tacit acceptance of it." Michel, New
Jersey Attorney Ethics (Gann, 2011), §13:4-1 p. 250.  Here,
plaintiff acknowledges she simply asked Ms. Kavanagh for assistance
or guidance about where to turn for help with her myriad of personal
problems.   Plaintiff acknowledges she did not ask Ms. Kavanagh to
represent her and that Ms. Kavanagh did not agree to do so.
Therefore, the Court finds that Ms. Kavanagh and K&K never
represented plaintiff in connection with Mr. Bell's death.

The next question to address is whether K&K's engagement in
this case is substantially related to its prior representation of
plaintiff in her worker's compensation and motion vehicle cases.  If
so, then R.P.C. 1.9(a) is triggered.  If not, R.P.C. 1.9 does not
apply.  In Trupos, supra, the Supreme Court addressed the analytic
framework for determining whether matters are substantially related:

> [F]or purposes of R.P.C. 1.9, matters are deemed to be
> "substantially related" if (1) the lawyer for whom
> disqualification is sought received confidential
> information from the former client that can be used
> against that client in the subsequent representation of
> parties adverse to the former client, or (2) facts
> relevant to the prior representation are both relevant and
> material to the subsequent representation. We adopt that
> standard because it protects otherwise privileged
> communications, see R.P.C. 1.6(a) (proscribing revelation
> of "information relating to representation of a client"),
> while also requiring a fact-sensitive analysis to ensure

> that the congruity of facts, and not merely similar legal
> theories, governs whether an attorney ethically may act
> adverse to a former client.

201 N.J. at 467.

The Court finds that the current matter and Ms. Bell's worker's compensation and motor vehicle cases are not substantially related. The compensation case involved plaintiff's shoulder injury and the second matter involved a traffic citation and subsequent court hearing. These had nothing to do with Mr. Bell's death. None of the discussions that were relevant to Ms. Bell's prior matters have any relevance to the present lawsuit. Further, facts relevant to the prior representation are not relevant and material to this case. Therefore, the matters are not substantially related and R.P.C. 1.9 does not apply.

Plaintiff argues that R.P.C. 1.9 applies because during the course of Ms. Kavanagh's engagement she learned "confidential information" that satisfies the first prong of the <u>Trupos</u> analysis. The Court agrees that if the confidential information relayed to Ms. Kavanagh arose out of plaintiff's compensation or motor vehicle cases, then R.P.C. 1.9(a) would be triggered. However, this did not occur. The confidential information relayed to Ms. Kavanagh had nothing to do with the firm's representation of her. Instead, the information was voluntarily disclosed by plaintiff. Further, it does not appear there was any "give and take" about the issues. In fact, plaintiff acknowledged that Ms. Kavanagh told her she could

not undertake to represent her.[9]  The Court finds that R.P.C. 1.9(a) and Trupos do not apply to this situation.  The analysis in Trupos was done in the context of deciding whether information learned in connection with a prior engagement was confidential, and relevant and material, to a current engagement.  Here, none of the information relevant to plaintiff's worker's compensation and motor vehicle cases fit into this category.  Here, plaintiff is focusing on her voluntarily disclosed comments and questions to Ms. Kavanagh about a subject entirely unrelated to her engagement.

Disqualification is a harsh remedy which must be used sparingly.  O Builders, 206 N.J. at 130.  The Court finds that Trupos does not apply to situations where a client voluntarily discloses "confidences" entirely unrelated to an ongoing representation.  Otherwise, it would be too easy for a nefarious client to disqualify a lawyer in a future unrelated matter.[10]  For this reason, the Court rejects plaintiff's argument that the

---

[9]Plaintiff's testimony did not coincide with her affidavit. Plaintiff averred that she spoke with Ms. Kavanagh about "the possibility of looking into whether there was a case to bring." J. Bell Aff. ¶8.  The Court finds that Ms. Bell is mistaken. First, plaintiff did not testify that this occurred.  Second, even though Ms. Kavanagh could not recall the specifics of her discussions with plaintiff, the Court credits her testimony that she would not discuss with plaintiff, or any person, a new matter adverse to Cumberland County.

[10]The possibility of abuses was touched on in O Builders, 206 N.J. at 123 n. 6 ("By the time R.P.C. 1.18 was adopted, the complaint that clients--either on their own or counseled by other lawyers--were consulting lawyers solely for the purpose of later disqualifying them had acquired a fair measure of credibility."). The Court does not find that this occurred here.

substantial relationship test is met because Ms. Kavanagh received
confidential information that can be used against plaintiff.
December 12, 2011 Letter Brief at 12-13.  It is, of course, true
that Ms. Kavanagh would not have learned the information unless she
represented plaintiff.  However, the information at issue that
plaintiff relayed was unrelated to Ms. Kavanagh's representation and
was voluntarily disclosed by plaintiff.  This is not the scenario
Trupos envisioned when it set forth its "substantial relationship"
test.

    4.  R.P.C. 1.18

    Having decided that R.P.C. 1.9(a) does not apply, this does not
end the Court's analysis.  The Court finds that an analysis of
R.P.C. 1.18 is appropriate.[11]  When Ms. Kavanagh met with plaintiff
in or about July and August, 2008, there is no question that
plaintiff was a current client of the firm.  However, giving
plaintiff the benefit of every doubt, she was also a prospective
client vis-a-vis her husband's death.  Although it may seem
anomalous that the same person can be a current and prospective
client at the same time, this can happen.  A "prospective client" is
"[a] person who discusses with a lawyer the possibility of forming
a client-lawyer relationship with respect to a matter."  R.P.C.
1.18(d).  Pursuant to this definition, if a current client discusses

---

[11]Technically, R.P.C. 1.18 may not apply because plaintiff
testified she did not ask Ms. Kavanagh to represent her in
connection with her husband's death.  However, the lines are
murky enough to warrant a discussion of R.P.C. 1.18.

a new matter with an attorney, he/she becomes a prospective client for the purpose of the new matter.

As to R.P.C. 1.18, the key provisions read as follows:

(a) A lawyer who has had discussions in consultation with a prospective client shall not use or reveal information acquired in the consultation, even when no client-lawyer relationship ensues, except as RPC 1.9 would permit in respect of information of a former client.

(b) A lawyer subject to paragraph (a) shall not represent a client with interests materially adverse to those of a former prospective client in the same or a substantially related matter if the lawyer received information from the former prospective client that could be significantly harmful to that person in the matter, except as provided in paragraph (c).

Thus, pursuant to R.P.C. 1.18, an attorney's consultation with a prospective client may preclude the attorney from accepting a subsequent representation adverse to the client even though an attorney-client relationship was not formed. As stated in O Builders, 206 N.J. at 113:

RPC 1.18 seeks a delicate balance between a client's right to protect communications made in the context of a consultation precedent to the actual retention of a lawyer, and the lawyer's right to be free to represent clients without being unduly restricted by the yoke of short-lived consultations that do not ripen into an attorney-client relationship.

Disqualification is appropriate under R.P.C. 1.18 where the matter of consultation and the adverse matter are the same or substantially related, and the information revealed during the consultation is significantly harmful to the former prospective client in the current adverse matter. Id. at 113-114. Plaintiff's discussions with Ms. Kavanagh satisfy the requirement that their

18

past consultation be the same or substantially related to this matter. As noted previously, the Court credits plaintiff's affidavit to the effect that she mentioned confidential details regarding her husband and the circumstances of his death to Ms. Kavanagh. Therefore, in order to disqualify K&K pursuant to R.P.C. 1.18, plaintiff must show that the confidential information she relayed could be significantly harmful to her in this matter.[12]

The term "significantly harmful" is not defined in the R.P.C.'s. In O Builders, the Court wrote:

> [W]e conclude that, in order for information to be deemed "significantly harmful" within the context of RPC 1.18, disclosure of that information cannot be simply detrimental in general to the former prospective client, but the harm suffered must be prejudicial in fact to the former prospective client within the confines of the specific matter in which disqualification is sought, a determination that is exquisitely fact-sensitive and specific.

The Court finds that defense counsel should not be disqualified pursuant to R.P.C. 1.18.[13] Disqualification is appropriate only if defense counsel received confidential information from plaintiff that could be significantly harmful to plaintiff in this case. This did not occur here because the allegedly confidential information relayed to Ms. Kavanagh is either already general public

---

[12]The initial burden of production is on plaintiff. If that burden is satisfied, the burden shifts to defense counsel. However, the burden of persuasion and proof remains on plaintiff. Id. at 126-127.

[13]Of course, Ms. Kavanagh is subject to the requirement in R.P.C. 1.18(a) that she should not use or reveal information she acquired from plaintiff except as R.P.C. 1.9 would permit. See also R.P.C. 1.6.

information, or is likely to be revealed at plaintiff's deposition or in other discovery. Cf. O Builders, 206 N.J. at 130.

The allegedly confidential information in plaintiff's December 8, 2011 affidavit is no doubt personal and sensitive. Nevertheless, most if not all of it is already contained in the "public record" including, but not limited to, newspaper articles, police reports, the CCPO's documents, and the Medical Examiner's documents. For example, plaintiff points to the fact she told Ms. Kavanagh she was questioned by the prosecutor because her mother-in-law told them she gave her son insulin and murdered him. However, this is the subject of newspaper articles. Plaintiff also points to the fact she told Ms. Kavanagh about all of the restraining orders, her custody issues, that she and her husband fought, and that her brother and mother-in-law argued at Mr. Bell's funeral. Although sensitive, none of this information is confidential or privileged. It could be that there are "tidbits" of references in Ms. Bell's December 8, 2011 affidavit that are not already in the public domain.[14] Nevertheless, this minimal information will in the Court's judgment be revealed during the course of the case. The references are undoubtedly germane to the circumstances surrounding Mr. Bell's

_____

[14]For purposes of this analysis the Court is assuming that all of the statements in Ms. Bell's December 8, 2011 affidavit were made to Ms. Kavanagh. The Court had the opportunity to observe plaintiff's demeanor and credibility when she testified on March 30, 2012. While the Court believes plaintiff appeared to be a generally credible witness, her recollection of events was not nearly as detailed when she testified in-person compared to what she relayed in her affidavit which was undoubtedly prepared by a third person(s).

death and it is virtually certain they will be the subject of
discovery.   Accordingly, since the alleged "confidential"
information plaintiff mentioned to Ms. Kavanagh is either publicly
known or will be revealed in discovery, the Court finds that the
information is not and could not be significantly harmful to
plaintiff's case within the meaning of R.P.C. 1.18.  Therefore,
disqualification pursuant to R.P.C. 1.18 is not appropriate.

     5.  <u>R.P.C. 1.7</u>

     As noted, there is a question whether plaintiff was a current
client of K&K when the firm entered its appearance in this case on
January 27, 2011.  Defendants say no because the compensation matter
settled on March 8, 2010.  However, the answer is not so simple
because there was a reopener in the settlement agreement that
permitted plaintiff to apply for additional benefits by March 8,
2012.  <u>See</u> Plaintiff's Brief, Exh. 8.  Ms. Kavanagh advised
plaintiff of this fact in a letter dated March 11, 2010, and stated,
"[i]f you require assistance in the future, you should contact me
sufficiently in advance of the two year period."  <u>Id.</u>

     The Court finds that because of Ms. Kavanagh's March 11, 2010
letter, she was in an implied attorney-client relationship with
plaintiff at least until November 2011 when the specter of a
conflict of interest was raised.  Before that time plaintiff
reasonably believed that Ms. Kavanagh was continuing to represent
her in connection with her compensation case, and Ms. Kavanagh knew
this and tacitly approved it.  This is sufficient to create an

21

implied attorney-client relationship.  See generally Robinson, 2012 WL 71730, at *1-2.  However, after the conflict issue was raised, plaintiff could not reasonably believe Ms. Kavanagh would continue to represent her.

Where that leaves things is that from the date K&K entered its appearance (January 27, 2011), until November 2011, Ms. Kavanagh continued to represent plaintiff while at the same time her husband and partner was defending this lawsuit.  R.P.C. 1.7 prohibits a lawyer from representing a client if the representation involves a concurrent conflict of interest.  A concurrent conflict exists if "representation of one client will be directly adverse to another client."  R.P.C. 1.7(a).  Despite this R.P.C., the Court will not disqualify defense counsel.

When deciding whether disqualification is appropriate the Court is mindful that this relief is disfavored and drastic.  Alexander, supra.  The Court must balance competing interests, weighing the need to maintain the highest standard of the profession against a client's right freely to choose its counsel.  Trupos, 201 N.J. at 462.  The Court should apply a "sense of practicality" to avoid unjust results.  Martin, 2011 WL 5080255, at *2.  Although what happened here is unusual, in the Court's judgment it does not warrant disqualification.  It is true that Ms. Kavanagh and plaintiff were technically in an attorney-client relationship from January 27, 2011 to November 2011, and during that time K&K was adverse to plaintiff in this matter.  However, the de facto end of

the attorney-client relationship occurred in March 2010 when plaintiff settled her compensation case. After that date plaintiff had no relevant communications with Ms. Kavanagh. Further, the Court credits Ms. Kavanagh's affidavit (¶2) and testimony (March 30, 2012 Tr. 38:7-10), that she never worked on this case. The Court also credits Ms. Kavanagh's testimony that because K&K did legal work for Cumberland County, she did not have any meaningful conversations with plaintiff about a potential lawsuit involving her husband's death at a County jail. Tr. 33:2-6, 15-25. Thus, nothing that occurred after January 27, 2011 compromised plaintiff's interests. Under these circumstances, and balancing the parties' interests, the Court finds that disqualification pursuant to R.P.C. 1.7 is not appropriate.

**SUMMARY**

At the outset of this opinion the Court mentioned it is convinced defense counsel could have and should have done some things differently. For example, if as defense counsel argues a conflict check was done at the outset of its engagement, there is no good explanation for why it did not learn the firm previously represented Ms. Bell. Defense counsel did not realize this until plaintiff was deposed.[15] Further, after the alleged conflict was

---

[15]The Court acknowledges it is unlikely, although not definite, that an earlier recognition of the potential conflict would have avoided this motion. Nevertheless, the issue could have been decided early in the case, thereby avoiding a substantial delay just when discovery was finally proceeding in earnest. All discovery in this case has been stayed until this motion is decided.

raised, defense counsel reviewed in detail plaintiff's files to study the details of its representation.  This could have exposed K&K to plaintiff's allegedly confidential and privileged information.  The appropriate course should have been to isolate the files and seek appropriate advice on what to do under the R.P.C.'s. In addition, plaintiff filed several of plaintiff's confidential documents with the court.  See January 10, 2012 Letter Brief at 5; Doc. No. 67-3.  Clearly these medical records should have been filed under seal pursuant to L. Civ. R. 5.3.  Moreover, even after being alerted to an alleged conflict in November 2011, defense counsel did not unequivocally inform plaintiff it would no longer represent her in her worker's compensation case until moments before the March 8, 2012 deadline was set to expire.  Also, K&K did not institute a formal written screening program to screen Ms. Kavanagh and plaintiff's files from this matter.  See Martin, 2011 WL 5080255, at *10-11.

The Court will fashion an Order to ameliorate the potential harmful consequences of defense counsel's actions.  Counsel will be Ordered to institute a formal screen between Ms. Kavanagh and this file.  Counsel will also be directed to return to plaintiff her complete files.  Although beyond the scope of its Order, defense counsel would be wise to review and update its conflict screening procedure to assure that instances of this type do not occur again.

Accordingly, for all the foregoing reasons, plaintiff's Motion to Disqualify Counsel for the Cumberland County Defendants is DENIED. An appropriate Order will be entered.[16]

s/Joel Schneider
JOEL SCHNEIDER
United States Magistrate Judge

DATED: May 23, 2012

---

[16]Plaintiff's motion also seeks to disqualify Kimberly A. Procopio, Esquire.  Ms. Procopio is not employed by K&K but she assisted with the defendants' defense when K&K was shorthanded. Since K&K is not disqualified, the same ruling applies to Ms. Procopio.  The Court also notes that K&K did not share confidential or sensitive information with Ms. Procopio regarding plaintiff.  K. Procopio February 17, 2012 Affidavit ¶13.